UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                            :

AJIT SODHI, Individually and on Behalf of All  :
Others Similarly Situated,                     :
                               Plaintiff,  :      14-CV-287 (JPO)
                                    :
                    -v-            :     OPINION AND ORDER
                                   :
GENTIUM *S.P.A.*, *et al.*,            :
                      Defendants. :
--------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

Plaintiff Ajit Sodhi brings this putative class action against Defendants Gentium *S.p.A.*[1] ("Gentium"); Jazz Pharmaceuticals Public Limited Company, Jazz Pharmaceuticals Italy, *S.r.l.*[2] (collectively "Jazz"); and Gentium directors and executives Khalid Islam, Gigliola Bertoglio, Laura Ferro, Bobby W. Sandage, Jr., Marco Brughera, Elmar Schnee, and Joyce Victoria Bigio.[3] Sodhi alleges that Defendants violated Sections 14(e) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(e), 78t(a); that Defendants violated Article 2395 of the Italian Civil Code; and that defendants breached their fiduciary duties to Gentium stockholders under Italian law. According to the submissions on the docket, only Sandage has been served.[4] Sandage now moves to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Sandage's motion is granted.

---

[1] "*S.p.A.*" denotes an Italian *società per azioni*.

[2] "*S.r.l.*" denotes an Italian *società a responsabilità limitata*.

[3] The claims against Jazz Pharmaceuticals Public Limited Company and Jazz Pharmaceuticals Italy S.R.L. have been dismissed without prejudice. (Dkt. No. 27.)

[4] Plaintiff claims that he has "commenced the process to serve the remaining defendants through the Hague Convention," but has not yet effected service. (Dkt. No. 25 at 1 n.1.)

1

I.     **Background**[5]

Gentium was an Italian pharmaceutical company specializing in the treatment of vascular

diseases related to cancer and cancer treatment.  (Dkt. No. 19, Amended Complaint ¶ 2

["Complaint"].)  Its American Depositary Shares ("ADS") traded on the Nasdaq Global Select

Market.  Gentium reported "spectacular growth" for 2012 and the first half of 2013.  (*Id.* ¶ 42.)

Throughout 2013, Gentium was in the process of securing regulatory approval in Europe and

elsewhere for its most promising product: Defitelio.[6]  In October of 2013, the European

Commission granted marketing authorization for Defitelio.  (*Id.* ¶ 47.)  Third-quarter 2013 sales

went up by 64% compared to the third quarter of 2012.  (*Id.* ¶ 48.)  By late 2013, based in large

part on the success of Defitelio, market analysts valued Gentium at $68-$78 per share.  (*Id.* ¶ 49.)

Jazz is a European pharmaceutical company with a broad portfolio of drugs authorized

for sale in Europe and the United States.  Jazz noticed Defitelio's strong performance and

determined that "[i]ncorporating Gentium into Jazz Pharmaceuticals is a strong strategic fit as

Defitelio would diversify [Jazz's] development and commercial portfolio and complement [its]

clinical experience in hematology/oncology . . . ."  (*Id.* ¶ 51 (statement of Jazz CEO).)  Jazz

decided to buy Gentium.

On December 19, 2013, Jazz and Gentium jointly announced that the former company

would acquire the latter through an all-cash tender offer.  Gentium's ADS closed at around

$55.66 the previous day.  (*Id.* ¶ 64.)  Jazz offered $57 per share to anyone who tendered her

shares by January 22, 2014.  (*Id.* ¶ 72.)  In connection with its recommendation that shareholders

---

[5] The following facts are taken from the Amended Complaint (Dkt. No. 19) and are taken as true
for the purposes of the instant motion.

[6] Defitelio had previously been designated an orphan drug by U.S., European, Korean, and
Australian drug regulatory bodies.  (Complaint ¶ 39.)

tender at $57, the Gentium board issued an SEC Schedule 14D-9 ("14D-9") statement, including a fair-price opinion from Jefferies LLC ("Jefferies"), a financial advisory firm. (*Id.* ¶ 74.) The tender offer was contingent on Jazz's receiving a majority of all outstanding Gentium shares. (*Id.* ¶ 71.) By the initial closing date of the offer, Jazz had acquired 87% of outstanding Gentium shares. It then extended the offering period to February 21, 2014. When the offer finally closed, Jazz had acquired 98% of outstanding shares. (*Id.* ¶ 72.) Gentium was delisted from the Nasdaq Global Select Market and became a wholly owned subsidiary of Jazz.

Sodhi alleges that Defendants' filings in connection with the tender offer were materially misleading and that the offer itself was the result of a "hopelessly flawed" process that ultimately resulted in an inadequate price. (*Id.* ¶¶ 4-5.) He alleges that Defendants were motivated by a desire to liquidate their "illiquid holdings in Gentium stock." (*Id.* ¶ 4.) Sandage held "134,500 options which fully vested upon the closing of the Merger . . . [resulting in a gain of] $6,859,500" (*id.* ¶ 57). In order to close the deal with Jazz quickly, Defendants sought to depress the perceived valuation of Gentium, in breach of their fiduciary duties to Gentium shareholders. To depress the price, Sodhi contends, Defendants disseminated a materially false or misleading 14D-9 and helped negotiate preclusive "deal protection devices." (*Id.* ¶¶ 9, 12.) These devices prevented other suitors from bidding up the price for Gentium shares. Ultimately, Sodhi alleges, Defendants were successful at rushing the deal through at an unfairly low price, thereby advancing their own liquidity interests at the expense of long-term shareholder value.

## II.    Discussion

Sandage moves to dismiss the Complaint on the grounds that (1) Sodhi has failed to allege any material omissions or misleading statements in the 14D-9; (2) Sodhi has failed to allege scienter; and (3) Sodhi has failed to allege an actionable breach of duty under Italian law.

A.      **Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006) (internal quotation marks omitted).  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Section 14(e) of the Securities Exchange Act provides, in pertinent part, that

> [i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . .

15 U.S.C. § 78n(e).  To sustain a claim under Section 14(e), a plaintiff must plead that the defendants acted with scienter.[7]  *See Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 961 (2d Cir. 1987) ("It is well settled in this Circuit that scienter is a necessary element of a claim for damages under § 14(e) . . . .").  Thus, to state a claim under Section 14(e), "a plaintiff must plead . . . an intent to defraud, knowledge of falsity, or a reckless disregard for the truth." *Id.* (internal quotation marks omitted).  Courts in this district have

---

[7] Plaintiff argues that mere negligence is sufficient to state a claim under Section 14(e). Plaintiff's argument is unavailing because the Second Circuit has squarely held that scienter is required under Section 14(e). *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 961 (2d Cir. 1987) (noting that "[a]llegations or proof of mere negligent conduct are insufficient" (internal quotation marks omitted)).

uniformly held that the heightened pleading requirements of the Private Securities

Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b) apply to

claims brought under Section 14(e).  *See, e.g.*, *Taro Pharm. Indus., Ltd. v. Sun Pharm.*

*Indus., Ltd.*, No. 09 Civ. 8262 (PGG), 2010 WL 2835548, at *7 (S.D.N.Y. July 13, 2010)

(stating that a "claim under Section 14(e) . . . is subject to a heightened pleading standard

pursuant to Fed. R. Civ. P. 9(b) and the [PSLRA]"); *Telenor E. Invest AS v. Altimo*

*Holdings & Invs. Ltd.*, 567 F. Supp. 2d 432, 444 (S.D.N.Y. 2008) (Chin, J.) ("As the

claims pertaining to § . . . 14(e) . . . specifically invoke anti-fraud provisions of the

Exchange Act, I subject them to the heightened standard of the PSLRA and Fed. R. Civ.

P. 9(b)."); *Gas Natural v. E.ON AG*, 468 F. Supp. 2d 595, 603 (S.D.N.Y. 2006) ("The

heightened pleading standards of Rule 9(b) . . . and the PSLRA apply to claims brought

under Section 14(e).").

     The PSLRA and Rule 9(b) establish heightened pleading requirements for

securities fraud cases.  Rule 9(b) requires that allegations of fraud be pleaded with

particularity.  And the PSLRA requires plaintiffs to "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind."  15

U.S.C. § 78u-4(b)(2).  "To qualify as 'strong' . . . an inference of scienter must be more

than merely plausible or reasonable—it must be cogent and at least as compelling as any

opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

551 U.S. 308, 314 (2007).  Scienter can be successfully pleaded in two ways: by pleading

facts sufficient to raise a "strong circumstantial" case of conscious misbehavior, or by

pleading "facts demonstrating that defendants had both the motive and an opportunity to

commit fraud."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).

To be liable under Section 14(e), the defendant must "make" the allegedly fraudulent statement or control a person who does. *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). "One 'makes' a statement by stating it." *Id.* And Section 20(a) imposes liability on any person who "directly or indirectly[] controls any person liable" under Section 14(e). 15 U.S.C. § 78t(a).

### B.    Material Omissions

Sodhi alleges that three[8] categories of omissions render Gentium's 14D-9 materially misleading. First, he alleges that Defendants[9] failed to disclose "[t]he basis upon which the Board concluded it would likely consider a transaction at a price of $57.00 per share." (Complaint ¶ 74(a).) Second, Sodhi alleges that Defendants failed to disclose "[a] fair summary of the key inputs in support of Jefferies['s] fairness opinion for the Merger." (*Id.* ¶ 74(b).) And, finally, Sodhi alleges that Defendants omitted "[t]he specific services Jefferies has provided to any of the parties involved in the transaction, or any of their affiliates, in the last two years and how much compensation was received for services rendered." (*Id.* ¶ 74(c).)

As a preliminary matter, Sandage contends that even if Sodhi meets the other requirements of Section 14(e), he cannot allege detrimental reliance because Gentium amended its 14D-9 to include a copy of the Complaint in this action before the tender offer period closed. Sandage cites *Taro*, 2010 WL 2835548, at *10, *Lions Gate Entm't Corp. v. Icahn*, No. 10 Civ. 08169 (HB), 2011 WL 1217245, at *1 (S.D.N.Y. Mar. 30, 2011), and *Wardrop v. Amway Asia*

---

[8] Sodhi has dropped two sets of allegations in response to Sandage's contention that the purported omissions underlying those allegations were not, in fact, omitted from the 14D-9. (Dkt. No. 25, Plaintiffs' Memorandum of Law, at 6 n.4.)

[9] Because the Section 14(e) claim fails on other grounds, the Court has no need to reach the "maker" question, and thus assumes arguendo that Sandage qualifies as a maker. The Section 20(a) claim also fails because it requires a primary violation by a controlled person, *see, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

*Pac. Ltd.*, No. 99 Civ. 12093 DC, 2001 WL 274067, at \*4 (S.D.N.Y. Mar. 20, 2001), for the proposition that annexing a copy of the complaint to an amended 14D-9 cures any misstatements that might have existed in a prior 14D-9. But these cases concern omissions that are, in fact, cured by the inclusion of the complaint. Here, Sodhi alleges that the initial 14D-9 failed to include information that is *not* included in the Complaint itself, and he states that he "does not know key inputs and assumptions" that were allegedly undisclosed. (Dkt. No. 25, Plaintiffs' Memorandum of Law, at 18.) No case stands for the illogical proposition that the mere filing of a complaint moots any Section 14(e) claim. (*Contra* Dkt. No. 21, Defendant's Memorandum of Law, at 16 ("Courts that have considered this issue have generally held that annexing a copy of a complaint to an amended filing is sufficient to satisfy [Section 14(e)'s] requirements and moot any [Section 14(e)] claim." (brackets, footnote, and internal quotation marks omitted).). A complaint cures an omission in a 14D-9 only where it contains the specific information alleged to be missing from the initial 14D-9. Indeed, *Lions Gate*, on which Sandage relies, distinguishes prior cases on precisely this ground. *Lions Gate*, 2011 WL 1217245, at \* 1 (distinguishing *Horsehead Res. Dev. Co v. B.U.S. Envtl. Servs., Inc.*, 916 F. Supp. 305 (S.D.N.Y. 1996)).

### 1.     The Board's Conclusion

Sodhi contends that omitting the "basis upon which the Board concluded it would likely consider a transaction at a price of $57.00 per share" renders the 14D-9 misleading. (Complaint ¶ 74(a).) Prior to approving the transaction, the Board received an opinion from Jefferies in which Jefferies included summaries of Wall Street analysts' valuations of the company and summaries of comparable transactions. Both of these summaries yielded prices higher than $57. Thus, Sodhi contends, "it is important to understand how Jefferies and the Board reached their earlier value conclusions and whether they were indicative of an alternative valuation perspective than what was ultimately disclosed in the 14D-9." (*Id.*)

The 14D-9, though, explains why the Board reached the conclusion that $57 per share is a fair price.  (*See* Dkt. No. 22, Declaration of Joseph N. Sacca, Exhibit 4, at 27 ["14D-9"].)  The 14D-9 notes that $57 per share represents "a 72.7% premium over the $33.00 per share closing price of the ADSs on October 23, 2013, the trading day following [Gentium's] announcement that it had received marketing authorization from the EU for Defitelio."  (*Id.*)  It explains, *inter alia*, that the deal gives shareholders a "149.7% premium over the $22.83 volume weighted average closing price of the ADSs for the ten days prior to September 27, 2013, the date that the Company Board decided to engage in a sale process."  (*Id.*)  And the 14D-9 explains that the offer "is not subject to financing or regulatory filings conditions" (*id.*), and that the "Board considered the risk that if [Gentium] did not accept [the] offer, there may not have been another opportunity" to sell the company (*id.*).

This is an ample explanation of why the Board concluded that $57 per share was a fair price.  And the Board explained why it did not hold out for a higher price: namely, that it believed it had a fair price already and that there was no reason to believe that a better price would come along in the future.  Even if the foregoing were not a sufficient explanation, the Board noted that, although the offer agreement precluded it from actively shopping for another buyer, the agreement did not prohibit the Board from accepting the unsolicited offer of another buyer.  (*Id.* at 28.)  The tender offer was well publicized.  Therefore, if a better offer were available, the Board retained the ability—subject to a potential termination fee—to change its recommendation on Jazz's offer.  (*Id.* ("The Company Board may withdraw or change its recommendation in favor of . . . the Offer, if . . . a Superior Proposal is received . . . and may terminate the Tender Offer Agreement if a Superior Proposal is received." (capitalization in original)).)

The Board's reasons for considering—and ultimately accepting—$57 per share simply were not omitted. Sandage's motion to dismiss is therefore granted as to this allegation.

### 2.    Jefferies's Inputs

The 14D-9 contained a summary of the reasons underlying Jefferies's opinion that $57 was a fair price. But, Sodhi contends, it omitted twelve key "inputs" that Jefferies used in its valuation. (Complaint ¶ 74(b)(1)-(12).) To derive a fair value for Gentium, Jefferies conducted a discounted cash flow ("DCF") analysis and an analysis comparing Gentium to other similar companies. Because of the "the inherent uniqueness of each pharmaceutical company in terms of its drug portfolio, development pipeline and the quality of patent protection, a [DCF analysis] . . . is typically preferred to 'relative' valuation techniques such as reviewing comparable companies or transactions." (Plaintiffs' Memorandum, at 9.) Thus, Sodhi argues, the particular inputs in Jefferies's DCF valuation are especially relevant here. Nonetheless, Sodhi contends that both valuations were materially misleading.

DCF analysis aims to estimate the net present value of a company. To do this, the analyst asks how much money would need to be invested today to equal the value of the estimated future net cash flow of the company (its projected revenues minus its projected costs, basically). A company's future cash flow must be discounted to equal its present value for two reasons. First, money today is worth more than money tomorrow. Second, the future cash flow is worth less than its nominal amount because it may not materialize—a going concern is, after all, a risky proposition. The DCF analyst, therefore, discounts the future cash flows to their present value using a statistic that combines these two discount rates: the weighted average cost of capital ("WACC"). Because future cash flows cannot be estimated for an infinite amount of time into the future, the analyst ordinarily projects the cash flows five or ten years into the future and then projects all remaining cash flows as a lump sum using a set value called a "perpetuity value." To

value Gentium, Jefferies used WACCs ranging between 10.7% and 11.7% and perpetuity values ranging between (1.0)% and 1.0%.  (14D-9, at 37.)  Using those numbers, Jefferies concluded that Gentium shares were worth between $42.15 and $51.91.  (*Id.*)

Relative valuations estimate the value of a company by looking at the prices paid for comparable companies.  The goal is to translate the values of comparable companies into a price per share for the company being valued.  To calculate this, Jefferies selected comparable companies and calculated their net values "as a multiple of [their] calendar year 2014 and calendar year 2015 estimated revenue[s]."  (14D-9, at 36.)  "Jefferies then applied a range of . . . estimated revenue multiples . . . derived from the selected companies to corresponding data" from Gentium.  (*Id.*)  It calculated that Gentium would be worth between $29 and $42 per share.

Under Section 14(e), "a misstatement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding whether to accept the tender offer."  *Macfadden Holdings, Inc. v. JB Acquisition Corp.*, 802 F.2d 62, 69 n.3 (2d Cir. 1986).  Sodhi contends that the 14D-9 was materially misleading because it failed to disclose "key inputs" into both the DCF and the relative valuations.  But a disclosure statement must contain only a "fair summary" of the underlying bases for a financial advisor's fairness opinion.  *Calleros v. FSI Int'l, Inc.*, 892 F. Supp. 2d 1163, 1175 (D. Minn. 2012).[10]  Investors, as a general matter, are *not* entitled to "disclosures sufficient to make [their] own independent assessment of a stock's value."  *Id.*; *see also Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)

_____

[10] In *Calleros*, the plaintiff—represented by the same attorney who represents Sodhi here—made allegations that are strikingly similar to those in the Complaint.  *See Calleros*, 892 F. Supp. 2d at 1175 ("Calleros's claims are predicated on his (alleged) entitlement to various categories of information including 'the financial multiples observed for each of the publicly traded companies' to which [the defendant company] was compared by [the financial advisor]; the 'rationale used to select a reference range' in [the] analysis; and 'free cash flow,' 'forward price to earnings multiples,' and other 'specific inputs and data . . . used." (internal alterations omitted)).

(stating, in the context of a challenge to a proxy statement, that "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor"); *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000) (addressing parallel disclosure obligations under Delaware law); *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 954 (Del. Ch. 2001) (Strine, V.C.). "[Q]uibbles with a financial advisor's work simply cannot be the basis of a disclosure claim." *In re 3Com S'holders Litig.*, Civ. A. No. 5067-CC, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) (Chandler, C.).

All of Sodhi's allegations regarding the DCF are properly characterized as "quibbles." Sodhi alleges that the 14D-9 failed to disclose "the inputs and assumptions employed by Jefferies to *derive* the range of discount rates (10.7%-11.7%) used in its DCF Analysis." (Plaintiffs' Memorandum, at 9 (emphasis added) (citing Complaint ¶ 74(b)(6)).) But the 14D-9 disclosed the multiples and, as Sodhi admits in his complaint, the choice of multiples is "discretion[ary]." (Complaint ¶ 74(b)(6).) *See In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) (Strine, V.C.) (stating that a minority stockholder determining whether to tender in a going-private transaction "would find it material to know the basic valuation exercises that [the financial advisor] undertook, the key assumptions that they used in performing them, and the range of values that were thereby generated"). Similarly, Sodhi complains that the 14D-9 left out its reasons for selecting "perpetuity growth rates [of] (1.0)% to 1.0%." (*Id.* ¶ 74(b)(8).) The reasons underlying Jefferies' choice of perpetuity values clearly falls into the category of "underlying details supporting a fairness opinion" that need not be disclosed in a 14D-9. *La. Mun. Police Emps.' Ret. Sys. v. Cont'l Res., Inc.*, 886 F. Supp. 2d 1255, 1264 (W.D. Okla. 2012). Finally, Sodhi alleges that "the 14D-9 failed to disclose the implied terminal earnings before interest, taxes, depreciation and amortization ('EBITDA') multiples based on Jefferies' selected perpetuity growth rate range in its DCF Analysis." (Plaintiffs' Memorandum, at 10 (citing

Complaint ¶ 74(b)(9).)  Sodhi has not plausibly alleged why Sandage's failure to include this particular datum rendered the 14D-9 misleading.  *Cf. Himmel v. Bucyrus Int'l, Inc.*, No. 10-C-1104, 2014 WL 1406279, at *19 (E.D. Wis. Apr. 11, 2014) (rejecting claim that failure to disclose "the underlying detail of the pricing multiples [used to calculate EBITDA] render[ed] the analysis materially misleading . . . .").

Sodhi's allegations regarding the relative valuations are of a similar character. (Plaintiffs' Memorandum, at 11 (arguing that the 14D-9 "does not disclose the key inputs, such as specific EV/CY2014P Revenue and EV/CY2015P Revenue multiples for the public companies observed by Jefferies in its Selected Public Companies Analysis" (citing Complaint ¶ 74(b)(1))); *id.* at 12 ("does not disclose the Transaction Value/Last Twelve Months ('LTM') Revenue and Transaction Value/One-year Forward Revenue multiples") (citing Complaint ¶ 74(b)(3)).)  They are similarly insufficient to allege a violation of Section 14(e).

Finally, Sodhi alleges omissions relating to valuation techniques that Jefferies might not have used.  (*Id.* at 12 ("The 14D-9 also fails to disclose whether Jefferies conducted any kind of benchmarking analysis . . . ."); *id.* at 13 ("The 14D-9 . . . omitted the specific risk adjustments applied to the various future scenarios and potential implications for Defitelio.").)  The 14D-9 explicitly notes that it is *not* a comprehensive discussion of everything Jefferies did and that it is "not a complete description of all analyses performed and factors considered by Jefferies in connection with its opinion."  (14D-9, at 35.)  This language is sufficient to put a reasonable investor on notice that the 14D-9 does not represent a complete description of all analyses performed and, therefore, makes it not misleading to omit any analysis that Jefferies may or may not have conducted.

### 3.     Jefferies's Other Work

Finally, Sodhi alleges that "[t]he 14D-9 also does not identify either the specific services Jefferies had provided to any of the parties involved in the transaction, or any of their affiliates, in the two years leading up to the Merger, or how much compensation Jefferies had received for services rendered." (Complaint ¶ 74(c).) But the 14D-9 disclosed Jefferies' compensation for its opinion and the fact that Jefferies's compensation was contingent on the transaction closing. (14D-9, at 38.) Without some basis for believing there is an undisclosed conflict of interest, a Section 14(e) plaintiff is not entitled to know the "business relationship [between financial advisor and client] over the past two years." *IBEW Local 98 Pension Fund v. Cent. Vt. Pub. Serv. Corp.*, No. 11-CV-222, 2012 WL 928402, at *6 (D. Vt. Mar. 19, 2012). Mere speculation that Jefferies might have a conflict of interest is insufficient to survive a motion to dismiss. *Id.* at *13.

Sodhi has not identified any material omissions or misstatements. Sandage's motion to dismiss could properly be granted on this ground alone. The Court will nonetheless consider scienter because the Complaint's failure adequately to allege scienter is an independently sufficient ground on which to grant the motion to dismiss.

### C.     Scienter

Sodhi argues that the Complaint pleads scienter sufficient to survive the PSLRA's exacting requirements for two reasons. First, he contends that Defendants had motive and opportunity to commit fraud. Second, he contends that Defendants were at least reckless with regard to the truth of the statements made in the 14D-9. Sandage moves to dismiss on the ground that neither theory is sufficient.

A securities plaintiff can plead scienter by alleging that the defendant had a motive and an opportunity to commit securities fraud. *In re Scholastic Corp.*, 252 F.3d at 74. The parties

here agree that Defendants had an opportunity to commit fraud by omitting material facts in the

14D-9.  The question is whether he had a motive.  "Motive is the stimulus that causes a person or

entity to act or to fail to act.  Such stimulus ordinarily anticipates a concrete benefit defendant

would realize by his conduct."  *Id.*  Here, Sodhi's theory is that Sandage wanted to *depress* the

price of the tender offer to increase the likelihood of finding a buyer because he stood to benefit

from the immediate vesting of his many stock options (the contracts for which allowed Sandage

to exercise the option if Gentium was acquired) and from the ability to sell his large—and,

presumably, illiquid—holding of Gentium shares.

Sandage argues that this theory of motive is not cognizable in a securities case.  After

all, why would Sandage—one of the largest stockholders in Gentium—want to depress the value

of his own holdings?  The Third Circuit, in *In re Digital Island Securities Litigation*, 357 F.3d

322, 330 (3d Cir. 2004), dealt with an identical theory of motive.  "[P]laintiffs' theory makes

little economic sense," the Third Circuit held, "because the directors' own stock options would

have been devalued if they tried to sell the company for less than full price."  *Id.* at 331 (internal

quotation marks omitted).  So too here.

A motive allegation, though, does not fail merely because the defendant is alleged to have

depressed the value of his own stock.  It is, in fact, possible that the value to the defendant of

being able to cash out options now is high enough to make this allegation plausible.  Consider a

defendant who has options that do not vest for a very long time.  Given the time value of money,

the defendant might prefer a lower price now to a higher price later.  He might, then, have an

incentive to cheapen the stock of the company, find a quick buyer, and cash out.  This would not

be in the interests of ordinary shareholders who can sell their shares at any time.

The problem here is that Sodhi does not allege any facts that make this inference

plausible, let alone "strong" within the meaning of the PSLRA.  Sodhi alleges that Sandage's

134,500 stock options vested immediately upon the closing of the deal and that such vesting

earned Sandage a quick payout of $6,859,500.  But Sodhi does not assert any reason to believe

that Sandage would prefer that amount now to a much higher amount later.  As the Third Circuit

noted in *Digital Island*, it will be the rare case in which a defendant has a motive to depress the

price of a stock that he owns.  *See* 357 F.3d at 330.  There is no reason to believe this is such a

case.

Sodhi's allegations of recklessness fare no better.  "Where motive is not apparent, it is

still possible to plead scienter by identifying circumstances indicating conscious [or reckless]

behavior by the defendant, though the strength of the circumstantial allegations must be

correspondingly greater."  *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)

(citations omitted), *overruled on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d

Cir. 1989) (en banc).  With respect to recklessness, Sodhi argues only that the Complaint put

Defendants on notice of the omissions in the 14D-9 and that their failure to address those

omissions after learning of them constitutes evidence of conscious misbehavior.  (Plaintiff's

Memorandum, at 15–16.)  This inference is not "at least as compelling" as the competing

inference that Defendants did not update the 14D-9 because they concluded—as the Court does

today—that none of the omissions were material and that several of them were not, in fact,

omissions.  *See Tellabs*, 551 U.S. at 314.

Accordingly, Sandage's motion to dismiss the federal securities claims against him is

granted.

### D.  Italian Law Claims

The Court has dismissed all of Sodhi's claims that arise under federal law.  The

Complaint fails to plead the citizenship of the parties.  Because it is the plaintiff's burden to

establish jurisdiction through the allegations of the complaint, this Court lacks jurisdiction over

the Italian law claims under 28 U.S.C. § 1332.  *See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44 (2d Cir. 1996) (stating that diversity of citizenship as basis for federal court's jurisdiction "should be distinctly and positively averred in the pleadings, or should appear with equal distinctness in other parts of record" (internal quotation marks omitted)).  Therefore, this Court has jurisdiction over Sodhi's remaining Italian claims only through the exercise of supplemental jurisdiction.  *See* 28 U.S.C. § 1367.

This Court declines to exercise supplemental jurisdiction over Sodhi's Italian law claims. *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (per curiam) (observing that once all federal claims are dismissed, state claims should generally be dismissed as well); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity— will point toward declining jurisdiction over the remaining state-law claims.").

### E.    Leave to Amend

Plaintiff requests leave to amend at the end of his brief in opposition to the motion to dismiss.  Plaintiff's request is denied.  Plaintiff has already had one opportunity to amend his Complaint.  He is "not entitled to an advisory opinion from the Court informing [him] of the deficiencies in the complaint and then an opportunity to cure those deficiencies."  *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007).  Plaintiff has not offered any proposed amendments, but from the facts as alleged in the Amended Complaint, the Court concludes that amendment would be futile.

**III.     Conclusion**

For the foregoing reasons, Sandage's motion to dismiss the Amended Complaint is

GRANTED.

The Clerk of the Court is directed to close the motion at docket number 20 and to close

the case.

SO ORDERED.

Dated:  January 22, 2015
        New York, New York

_____
            J. PAUL OETKEN
       United States District Judge

17